UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------

GUIDO MALATO,

                            Petitioner,

                -v.-

DIGITALOCEAN LLC,

                            Respondent.

------------------------------

25 Civ. 2319 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Petitioner Guido Malato claims to have lost nearly $6 million worth of Bitcoin that he maintained on a server provided by Respondent DigitalOcean, LLC ("DigitalOcean"), as a result of an October 2021 hack of DigitalOcean's internal network. More than two years after the hack, in December 2023, Mr. Malato brought an arbitration against DigitalOcean (the "Arbitration") before the American Arbitration Association ("AAA"); one year later, on December 20, 2024, arbitrator J. Franklin McCreary (the "Arbitrator") issued a final award (the "Award") finding in favor of DigitalOcean on all claims. Mr. Malato has filed a motion for summary judgment to vacate that Award, and DigitalOcean has filed a cross-motion for summary judgment to confirm the Award. For the reasons set forth in the remainder of this Opinion, the Court denies Mr. Malato's motion and grants DigitalOcean's motion.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties and Their Relationship

Mr. Malato is a citizen of Brazil who, during the relevant time period, was

the owner of Cryptal Digital LLC, a Florida limited liability company, and

GMalato Serviços e Negocios Digitais LTDA, a Brazilian limited liability

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with their cross-motions for summary judgment. The Court primarily sources facts from Petitioner's Statement of Undisputed Material Facts filed pursuant to Local Civil Rule 56.1 ("Pet. 56.1" (Dkt. #10-1)); Respondent's Response to Petitioner's Statement of Undisputed Material Facts ("Resp. 56.1") and Respondent's Counterstatement of Additional Material Facts ("Resp. Counter-56.1"), both of which are contained in docket entry 18, as well as the exhibits thereto ("Resp. Ex. [ ]" (Dkt. #18-1, 18-2)); the Arbitrator's Final Award dated December 20, 2024 (the "Award" (Dkt. #11-1)); DigitalOcean's Terms of Service during the relevant time period ("TOS" (Resp. Ex. B); the Expert Report of the Boaventura Consulting Expert Group ("Boaventura Report" (Dkt. #11-2); the Expert Report of Todd Renner, dated October 29, 2024 ("Renner Report" (Dkt. #11-3)); the Rebuttal Expert Report of Erico Manfredi and Fabrizio Alves ("Rebuttal Report" (Dkt. #11-4)); the Declaration of Guido Malato ("Malato Decl." (Dkt. #11-5)); and the Declaration of Adrianne Cherpak ("Cherpak Decl." (Resp. Ex. A)).

Citations in this Opinion to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. *See* Local Rule 56.1(d). Where a party's Rule 56.1 Statements are not followed by citations to admissible evidence, the Court does not consider them. *See* Local Rule 56.1(d) ("Each statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, must be followed by citation to evidence that would be admissible and set forth as required by Fed. R. Civ. P. 56(c)"). Similarly, where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and not contested by the other party, or contested with only a conclusory statement by the other party, the Court considers such facts to be true. *See* Local Rule 56.1(c), (d); *Biberaj* v. *Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." (internal quotation marks omitted) (quoting *T.Y.* v. *N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009))). Petitioner elected not to respond to Respondent's Counterstatement of Additional Material Facts, and the Court therefore considers the statements presented in that Counterstatement to be true.

For ease of reference, the Court refers to Petitioner's memorandum of law in support of his motion for summary judgment as "Pet. Br." (Dkt. #11); to Respondent's amended memorandum of law in support of its cross-motion for summary judgment and in opposition to Petitioner's motion as "Resp. Br." (Dkt. #20); to Petitioner's reply memorandum and opposition to Respondent's motion as "Pet. Reply" (Dkt. #23); and to Respondent's reply memorandum as "Resp. Reply" (Dkt. #26).

company.  (Pet. 56.1 ¶¶ 1, 4).  Mr. Malato's business in Cryptal Digital LLC involved managing digital assets for clients in Brazil; he claimed that while his business had been stable for a period of years, vicissitudes in the cryptocurrency markets in October 2021 had "severely damag[ed] the Petitioner's business and eviscerated the company's investment positions."  (*Id.* ¶ 6).

DigitalOcean is a "cloud infrastructure provider offering services that allow customers to create and operate virtual machines (also known as 'Droplets') that those customers can use for a variety of purposes, such as hosting a website or blog, developing or testing software, storing data, and more."  (Pet. 56.1 ¶ 2).  Mr. Malato signed up for a DigitalOcean account on January 15, 2016.  (Resp. Counter-56.1 ¶ 2).  In or about October 2021, Mr. Malato maintained 65.93 bitcoins, which he later estimated to have a value of approximately $6.87 million, on a Droplet maintained by DigitalOcean.  (Pet. 56.1 ¶ 7).

In signing up for an account with DigitalOcean, Mr. Malato accepted the company's then-current Terms of Service, which, according to DigitalOcean, "made clear that DigitalOcean would provide its customers with cloud-hosting Services, but the responsibility for protecting data stored on DigitalOcean's Services would lie with the customer."  (Resp. Counter-56.1 ¶¶ 2-3; *see also* TOS; *see generally* Renner Report ¶¶ 66-69 (discussing "shared responsibility model" adopted by major cloud providers, including DigitalOcean, pursuant to which "DigitalOcean customers … are responsible for securing the data stored

3

on DigitalOcean services")).  In particular, Mr. Malato agreed with DigitalOcean

that:

> a. He was responsible for safeguarding his Droplet, including through "maintain[ing] appropriate security… which may include the use of encryption technology" ([TOS] § 4.6);
>
> b. He was using DigitalOcean's services at his own risk and subject to a disclaimer of any warranty relating to DigitalOcean's services being "secure" (*id.* § 9.1);
>
> c. Any potential liability would be limited "to the fullest extent permitted by law … [including for] any indirect, incidental, special, consequential or punitive damages … arising out of or relating to [Malato's] access to or use of, or inability to access or use, the Websites and Services or any materials or content on the Websites and Services … [Malato] agree[s] [DigitalOcean] will have no liability for any data that may be destroyed, lost or otherwise rendered inaccessible, whether because [Malato] failed to backup [his] data or for any other reason." (*id.* § 10.1);
>
> d. DigitalOcean could not be found liable for any indirect, incidental, special, consequential or punitive damages arising out of or relating to his access or use of the Services; that any aggregate liability for any claims arising out of or relating to the TOS or the Services is limited to the amount Malato paid DigitalOcean for the Services at issue in the month prior to the event or circumstance giving rise to the claim; and that this limitation of liability was "an essential element of the basis of the bargain between" the parties (*id.* §§ 10.1-10.3); and
>
> e. Malato "agree[s] to be billed on a recurring basis and to be automatically charged by [DigitalOcean] or [DigitalOcean's] Payment Processors using [his] Payment Methods upon invoicing" and that DigitalOcean "reserve[d] the right to deactivate, terminate, prevent access to, disable services for, and/or delete any Accounts or access to the Websites and Services at any time at [its] sole discretion, including for nonpayment, late payment, or failure to

charge [the] Payment Methods upon invoicing" (*id.* § 6.3).

(Resp. Counter-56.1 ¶ 3(a)-(e) (quoting TOS)).

### 2. The October 2021 Incident

Mr. Malato claims that, as a result of a hack of DigitalOcean's internal servers in October 2021, his Bitcoin reserve was lost. In particular, he claims to have received "a short email from DigitalOcean" advising him that the company had detected unauthorized access to Mr. Malato's Droplet. (Pet. 56.1 ¶ 13). Mr. Malato subsequently checked his Droplet and realized that all of the Bitcoin was missing. (*Id.* ¶ 14).

The specifics of the hacking incident are hotly disputed between the parties, each of whom retained experts to opine on the cause. Mr. Malato posits that on October 10, 2021, an outside actor sent a phishing email via a customer support ticket; when DigitalOcean support agents opened the email, they opened a link to malware, which then compromised DigitalOcean's accounts, including Mr. Malato's. (Pet. 56.1 ¶¶ 9-10, 12; *see also* Boaventura Report §§ 9-10; Rebuttal Report 1, 23-32, 38-41). On October 24, 2021, the outside actor "accessed support tooling, including the ability to view the console of customer droplets and put Droplets into recovery mode." (*Id.* ¶ 10). In so doing, the outside actor was able to access, and clean out, Mr. Malato's Droplet. (*See* Resp. Counter-56.1 ¶¶ 5-15 (articulating DigitalOcean's explanation of the hack)).

Mr. Malato lays blame for the phishing attack (and his consequent losses) squarely at DigitalOcean's feet.  Among other things, his expert witnesses theorize that there were only three possible scenarios that could have led to the loss of his Bitcoin, and that "[i]n each of the three possible scenarios a common element is the unavoidable conclusion that the theft can only have occurred but for [DigitalOcean's] gross negligence."  (Pet. Br. 3).  More broadly, Mr. Malato's experts opine that

> [The October 2021 hack and prior similar] instances collectively show a pattern where threat actors exploited human factors, using deceptive methods to bypass technological defenses.  This reliance on social engineering tactics indicates potential weaknesses in DigitalOcean's internal security awareness and anti-phishing protocols.  The findings across these areas suggest a security posture that was reactive rather than proactive, leaving DigitalOcean exposed to several key vulnerabilities:
>
> 1. Inconsistent application of endpoint security tools across critical infrastructure.
>
> 2. Procedural delays and complexity in incident response, which hindered rapid containment.
>
> 3. [Virtual Private Network ("VPN")] and [Two-Factor Authorization ("2FA")] policies that provided exploitable gaps for unauthorized access.
>
> 4. Dependency on external security programs without adequate internal proactive measures.
>
> 5. Logging limitations that reduced DigitalOcean's ability to conduct comprehensive forensic analysis post-incident.

> These weaknesses collectively indicate that DigitalOcean's security practices [have not] met industry standards for maintaining a secure cloud infrastructure, supporting the argument that their approach was insufficient to protect against foreseeable risks.

(Rebuttal Report 10-11).

DigitalOcean's expert witness opined instead that the phishing attack was extremely sophisticated. (*See, e.g.,* Renner Report ¶¶ 56 ("The threat actor(s) registered the domain in September 2021, just a month before the attack. To date, the domain has not been flagged as malicious by any security vendors in VirusTotal, indicating it was likely used only once in the attack against DigitalOcean and would not have been flagged as malicious, even if examined by security personnel."), 61 ("Much like the phishing infrastructure used in this attack, the threat actor(s) deployed customized malware specific to the attack on DigitalOcean, a tactic that demonstrates high levels of sophistication and substantially inhibits the ability of malware defensive controls to identify malicious code.")). Given that sophistication, DigitalOcean's expert argued that the company's then-current cybersecurity protocols were reasonable, if not ultimately successful against attacks:

> Based on my review of the documents produced to me, among other documents listed in Appendix 2 and my general background and expertise, I have concluded the following:
>
> a) DigitalOcean had reasonable, industry-accepted cybersecurity controls in place to prevent and detect malicious activity within their corporate environment.
>
> b) The Claimant's Droplet was compromised by a sophisticated threat actor as part of an advanced,

highly targeted attack specifically designed to bypass DigitalOcean's safeguards.

c) Per the industry-accepted Shared Responsibility Model, the Claimant was responsible for securing the contents in the Droplet.

d) The Claimant failed to implement the necessary safeguards to secure Cryptocurrency.

(*Id.* ¶ 28). In particular, DigitalOcean's expert opined that Mr. Malato's failings included: (i) maintaining domain names and social media profiles that specifically referenced Bitcoin; (ii) storing millions of dollars of Bitcoin in a "hot wallet," *i.e.*, a wallet where the private key was stored online; and (iii) engaging in such conduct despite contemporaneous news accounts of other hacks. (*Id.* ¶¶ 71-84).[2]

### 3.    The Immediate Post-Hack Conduct

Somewhat curiously, Mr. Malato continued to use his Droplet after the hacking incident. (Resp. Counter-56.1 ¶ 18). Indeed, according to DigitalOcean, Mr. Malato used and paid for his Droplet through September 2022. (*Id.*). Thereafter, however, Mr. Malato stopped paying for DigitalOcean's services, eventually accruing a balance of $6,399.04. (*Id.* ¶¶ 19-21). More than one year after the hack, on November 21, 2022, Mr. Malato first advised DigitalOcean of the missing Bitcoin. (*Id.* ¶ 22).

---

[2]    Unsurprisingly, Mr. Malato disputes the expert's opinions concerning both the reasonableness of DigitalOcean's cybersecurity safeguards and his contributory negligence, and submitted a lengthy rebuttal report addressing each. (*See* Rebuttal Report).

### 4.     The Commencement of the Arbitration

On December 6, 2023, Mr. Malato filed his initial Arbitration Demand and Statement of Claim with AAA, asserting fraudulent misrepresentation, gross negligence, and punitive damages.  (Resp. Counter-56.1 ¶ 24). DigitalOcean filed its Response and Counterclaim on February 15, 2024 (*id.* ¶ 25), and eight days later, Mr. Malato filed his Response to DigitalOcean's Counterclaim (*id.* ¶ 27).  The Arbitrator was appointed on March 6, 2024.  (*Id.* ¶ 28).

After a preliminary management conference was convened, Mr. Malato filed an Amended Statement of Claim that DigitalOcean then moved to dismiss. (Resp. Counter-56.1 ¶¶ 29-32).  On June 10, 2024, the Arbitrator denied the motion to dismiss and the parties proceeded to discovery.  (*Id.* ¶¶ 33-34).  On November 6, 2024, the parties agreed to request a document-only decision and forego an evidentiary hearing; they jointly proposed this course of action to the Arbitrator, who accepted their proposal.  (*Id.* ¶ 37).  Each side submitted an expert report along with other materials to the Arbitrator.  (*Id.* ¶¶ 38-40 (noting submission of Renner and Rebuttal Reports to the Arbitrator)).  On December 12, 2024, the Arbitrator confirmed with the parties that he "ha[d] received everything that he needs[.]"  (*Id.* ¶ 40).

### 5.     The Award

The parties contemplated that the Arbitration would proceed in two phases, with liability determined in Phase I and damages, if and as

9

appropriate, determined in Phase II. (Award 1). On December 20, 2024, the

Arbitrator issued the Award, which found in favor of DigitalOcean on all claims.

After reviewing the circumstances of the hack, the Arbitrator proceeded

to consider the Terms of Service, including the specific shared responsibility

provisions outlined *supra*. (Award 1-2). The Arbitrator concluded that,

"[b]ased on these provisions Digital is not responsible for safekeeping the

assets held in Malato's Droplet and is not liable to Malato for his losses. Digital

is not in breach of the TOS contract." (*Id.* at 2). In so concluding, the

Arbitrator rejected Mr. Malato's arguments regarding DigitalOcean's gross

negligence, finding instead that "Digital's expert opined that Digital had

reasonable industry accepted cyber-security controls in place to prevent and

deter malicious activity within their corporate environment. I find this opinion

to be persuasive and to be uncontroverted by Malato or his expert." (*Id.*).

The Arbitrator then turned to DigitalOcean's counterclaims for Mr.

Malato's unpaid service charges. Given his previous conclusion regarding

DigitalOcean's conduct, the Arbitrator found no basis for non-payment:

> Having found Digital's conduct to not have been grossly negligent, Malato is liable for the services as called for by the TOS. Since the parties appear to agree that the amount, if owed, is $6,399.04, there is no need for a Phase II hearing. The TOS does not provide for interest on this amount.

(Award 2). The Arbitrator also resolved the allocation of payment for

administrative, arbitrator's, and attorneys' fees. (*Id.* at 2-3).

10

### B.   Procedural Background

On March 20, 2025, Mr. Malato filed a petition with this Court to vacate the Award.  ("Petition" (Dkt. #1)).  On March 26, 2025, the Court issued an order directing him to move for vacatur by means of a summary judgment motion.  (Dkt. #2).

On April 2 and 3, 2025, Mr. Malato requested that the Clerk of Court issue a summons for DigitalOcean.  (Dkt. #4, 5).  The Clerk issued an electronic summons on April 4, 2025.  (Dkt. #6).  According to the Affidavit of Service filed on May 15, 2025, service was effected on May 14, 2025, by leaving the Petition with "Zack Nelson who as Senior Manager is authorized by appointment or by law to receive service of process for DigitalOcean LLC." (Dkt. #9).[3]

On May 16, 2025, Mr. Malato filed his motion for summary judgment and supporting papers.  (Dkt. #10-11).  On June 16, 2025, DigitalOcean filed its cross-motion for summary judgment to confirm the Award and supporting papers.  (Dkt. #17-20).  Mr. Malato filed his responsive submission on July 3, 2025 (Dkt. #23), and DigitalOcean filed its responsive submission on July 15, 2025 (Dkt. #26).

---

[3]   DigitalOcean counters that Mr. Nelson is a Senior Manager, IT Audit & Risk who, despite his title, is not "an officer, general agent, or managing agent at DigitalOcean." (Cherpak Decl. ¶¶ 2-4).

## DISCUSSION

### A.    Applicable Law

#### 1.    Judicial Review of Arbitration Awards

Federal law provides for vacatur of arbitration awards "only in very unusual circumstances." *First Options of Chi., Inc.* v. *Kaplan,* 514 U.S. 938, 942 (1995). "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." *Oxford Health Plans LLC* v. *Sutter,* 569 U.S. 564, 569 (2013) (quoting *E. Assoc. Coal Corp.* v. *Mine Workers,* 531 U.S. 57, 62 (2000)). The Second Circuit has underscored this point, holding that courts should exercise an "extremely deferential standard" when reviewing arbitration awards. *Porzig* v. *Dresdner, Kleinwort, Benson, N. Am. LLC,* 497 F.3d 133, 139 (2d Cir. 2007). The "general rule [is] that '[a]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.'" *Rich* v. *Spartis*, 516 F.3d 75, 81 (2d Cir. 2008) (second alteration in original) (quoting *Willemijn Houdstermaatschappij, BV* v. *Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir. 1997)).

#### 2.    Vacatur of Awards Under the FAA

##### a.    The Limited Bases for Vacatur

The FAA creates "mechanisms for enforcing arbitration awards: a judicial decree confirming an award, an order vacating it, or an order modifying or

correcting it." *Hall St. Assocs., L.L.C.* v. *Mattel, Inc.,* 552 U.S. 576, 582 (2008) (citing 9 U.S.C. §§ 9-11).  A court must grant a motion to confirm an arbitration award unless the award "is vacated, modified, or corrected" under § 10 or § 11 of the FAA.  *Id.*  There are four statutory grounds for vacatur:

> (1)    where the award was procured by corruption, fraud, or undue means;
>
> (2)    where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3)    where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4)    where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

### b.    Manifest Disregard of the Law

Mr. Malato argues that that Award should be vacated because the Arbitrator (i) manifestly disregarded the law, (ii) displayed evident partiality towards DigitalOcean, and (iii) deprived him of a fundamentally fair hearing. (*See generally* Pet. Br.; Pet. Reply).  The Court discusses these proffered bases for vacatur in the order that Mr. Malato argues them.

The Second Circuit has "held that 'as judicial gloss on the[ ] specific grounds for vacatur of arbitration awards' in the FAA, an arbitrator's 'manifest disregard' of the law or of the terms of the arbitration agreement 'remains a

13

valid ground for vacating arbitration awards.'" *Seneca Nation of Indians* v. *New York*, 988 F.3d 618, 625 (2d Cir. 2021) (quoting *Schwartz* v. *Merrill Lynch & Co.*, 665 F.3d 444, 451-52 (2d Cir. 2011)).  However, a court may vacate on this basis only in "those exceedingly rare instances where some egregious impropriety on the part of the arbitrator[ ] is apparent."  *T.Co Metals, LLC* v. *Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010) (alteration in original) (internal quotation marks omitted) (quoting *Stolt-Nielsen SA* v. *AnimalFeeds Int'l Corp.*, 548 F.3d 85, 91 (2d Cir. 2008)).  Thus, in order "[t]o succeed in challenging an award under the manifest disregard standard, a party must make a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it."  *Seneca Nation of Indians*, 988 F.3d at 626 (internal quotation marks omitted) (quoting *Schwartz*, 665 F.3d at 452); *accord Westerbeke Corp.* v. *Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208-09 (2d Cir. 2002).

"[An] award should be enforced, despite a court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached." *T.Co Metals, LLC*, 592 F.3d at 339 (internal quotation marks omitted) (quoting *Stolt-Nielsen SA*, 548 F.3d at 92).  A "barely colorable justification" exists so long as the arbitrators had reasoning on which they "could have justifiably rested their decision."  *Willemijn Houdstermaatschappij, BV*, 103 F.3d at 13-14 (finding that a proffered justification satisfied the "barely colorable" standard because it presented no "error that an average person qualified to serve as an

14

arbitrator should have instantaneously perceived and corrected"); *accord*

*Smarter Tools Inc.* v. *Chongqing SENCI Imp. & Exp. Trade Co.*, 57 F.4th 372, 383

(2d Cir. 2023); *Weiss* v. *Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019).

### c.    Evident Partiality

An arbitration award may be vacated for "evident partiality or corruption"

under Section 10(a)(2) "only where a reasonable person would have to conclude

that an arbitrator was partial to one party to the arbitration." *Scandinavian

Reinsurance Co. Ltd.* v. *St. Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 72 (2d

Cir. 2012) (quoting *Applied Indus. Materials Corp.* v. *Ovalar Makine Ticaret Ve

Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007) (in turn quoting *Morelite Const.

Corp. (Div. of Morelite Elec. Serv., Inc.)* v. *N.Y.C. Dist. Council Carpenters Ben.

Funds*, 748 F.2d 79, 84 (2d Cir. 1984))).  The party moving to vacate the award

must show "something more than the mere 'appearance of bias,'" and the

showing "must be direct and not speculative." *Morelite Const. Corp.*, 748 F.2d

at 83.  Still, "[a] conclusion of partiality can be inferred 'from objective facts

inconsistent with impartiality.'" *Scandinavian Reinsurance Co. Ltd.*, 668 F.3d

at 72 (quoting *Pitta* v. *Hotel Ass'n of N.Y.C., Inc.*, 806 F.2d 419, 423 n.2 (2d Cir.

1986)).

Partiality can be found where there is a demonstrated motive for an

arbitrator to favor one party over the other.  *See, e.g., Commonwealth Coatings

Corp.* v. *Continental Cas. Co.*, 393 U.S. 145, 146-49 (determining that an

undisclosed business relationship with a party constituted arbitrator

partiality).  "Among the circumstances under which the evident-partiality

15

standard is likely to be met are those in which an arbitrator fails to disclose a relationship or interest that is strongly suggestive of bias in favor of one of the parties." *Scandinavian Reinsurance Co. Ltd.*, 668 F.3d at 72; *see also Pers. Staffing Grp., LLC* v. *XL Ins. Am., Inc.*, No. 22 Civ. 10259 (JPO), 2024 WL 4667253, at \*8 (S.D.N.Y. Nov. 4, 2024), *appeal withdrawn*, No. 24-3146, 2025 WL 1575564 (2d Cir. May 9, 2025).

"Evidence of corruption must be abundantly clear in order to vacate an award under [Section] 10(a)(2)." *Kolel Beth Yechiel Mechil of Tartikov, Inc.* v. *YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)).  And "the unique role of arbitrators, whose special expertise arises from wide experience in their fields, sometimes leads to a gain of their professional knowledge and skill at the cost of the appearance of less than complete impartiality." *Pitta*, 806 F.2d at 423 (citing *Florasynth, Inc.* v. *Pickholz*, 750 F.2d 171, 173-74 (2d Cir. 1984); *Morelite Construction Corp.*, 748 F.2d at 83).

### d.    Arbitrator Misconduct

Under Section 10(a)(3), vacatur is warranted if the arbitrator engaged in misconduct "in refusing to postpone the hearing, upon sufficient cause shown," "in refusing to hear evidence pertinent and material to the controversy," or in engaging in "other misbehavior" that prejudiced a petitioner's rights.  *See* 9 U.S.C. § 10(a)(3).  Arbitrators are "not required to hear all the evidence proffered by a party," but only to "give each of the parties to the dispute an adequate opportunity to present its evidence and argument."  *Tempo Shain Corp.* v. *Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997), *cited in Ainsworth* v.

16

*Spartan Cap. Sec., LLC*, No. 25 Civ. 5039 (DEH), 2026 WL 472586, at *4 (S.D.N.Y. Feb. 19, 2026); *accord Lanesborough 2000, LLC* v. *Nextres*, LLC, 167 F.4th 33, 41 (2d Cir. 2026).

"It is well settled that procedural questions that arise during arbitration, such as ... which evidence to receive or exclude, are left to the sound discretion of the arbitrator and should not be second-guessed by the courts." *Charleston Immersive/Interactive Media Studio, LLC* v. *Aydin*, No. 24 Civ. 4943 (PAE), 2025 WL 219933, at *4 (S.D.N.Y. Jan. 16, 2025) (quoting *Nat'l Football League Mgmt. Council* v. *Nat'l Football League Players Ass'n*, 820 F.3d 527, 545 (2d Cir. 2016)).  The party seeking vacatur must demonstrate that the arbitrators' exclusion of evidence was prejudicial, such that the party's "right to be heard [was] 'grossly and totally blocked.'" *Stifel, Nicolaus & Co., Inc.* v. *Forster*, No. 14 Civ. 6523 (RWS), 2015 WL 509684, at *5 (S.D.N.Y. Feb. 6, 2015) (quoting *Kruse* v. *Sands Brothers & Co., Ltd.*, 226 F. Supp. 2d 484, 485 (S.D.N.Y. 2002)).

With particular regard to postponements, arbitrators "must be empowered to enforce procedural deadlines," and "[t]he time frames that arbitrators allow under approved schedules for discovery ... ordinarily are sufficient to provide [the parties] with adequate opportunity to present evidence and arguments." *See Landmark Ventures, Inc.* v. *InSightec. Ltd.*, 63 F. Supp. 3d 343, 352 (S.D.N.Y. 2014) (quoting *Triomphe Partners, Inc.* v. *Realogy Corp.*, No. 10 Civ. 8248 (PKC), 2011 WL 3586161, at *5 (S.D.N.Y. Aug. 15, 2011)).  A court's "review is restricted to determining whether the procedure was fundamentally unfair," and unless "fundamental fairness is violated,

17

arbitration determinations will not be opened up to evidentiary review." *Tempo Shain Corp.*, 120 F.3d at 20; *accord Barron* v. *Shapiro*, No. 25-77, 2026 WL 251659, at *2 (2d Cir. Jan. 30, 2026) (summary order).

### 3.    Summary Judgment Under Federal Rule of Civil Procedure 56

As noted above, courts treat an application to confirm or vacate an arbitral award as akin to a motion for summary judgment. *City of N.Y.* v. *Mickalis Pawn Shop, LLC*, 645 F.3d 114, 136 (2d Cir. 2011) (citing *D.H. Blair & Co.*, 462 F.3d at 109). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, "'[a] motion for summary judgment may properly be granted ... only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law.'" *Rogoz* v. *City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor* v. *Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).

"[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC* v. *Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Negrete* v. *Citibank, N.A.*, 237 F. Supp. 3d 112, 122 (S.D.N.Y. 2017) (quoting *Liberty Lobby*, 477 U.S. at 248), *aff'd,* 759 F. App'x 42 (2d Cir. 2019) (summary order). And where, as here, "parties file cross-motions

18

for summary judgment, ... each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks omitted and alteration adopted) (quoting *Morales* v. *Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

## B.    Analysis

### 1.    Petitioner Has Not Timely Moved to Vacate the Partial Final Award

Before the Court addresses the merits of the parties' arguments, it begins by addressing their threshold dispute as to whether Mr. Malato's Petition to vacate the Award was timely.  The FAA requires that any motion to vacate an arbitral award "must be served ... within three months after the award is filed or delivered."  9 U.S.C. § 12.  "[A] party may not raise a motion to vacate, modify, or correct an arbitration award after the three[-]month period has run, even when raised as a defense to a motion to confirm."  *Florasynth*, 750 F.2d at 175; *see also id.* (noting both that "[n]o exception to this three month limitations period is mentioned in the statute," and that "there is no common law exception to the three month limitations period on the motion to vacate").

On the issue of equitable tolling, a sister court in this District recently observed that:

> [T]he Second Circuit has not reached the question as to whether the equitable tolling doctrine applies to the FAA. *See Dalla-Longa* v. *Magnetar Capital LLC*, 33 F.4th 693, 697 (2d Cir. 2022) ("[The Second Circuit] need not reach the question of whether there may ever be

19

equitable exceptions to the rule of strict compliance with § 12's three-month deadline, because [Appellant] has not shown any equitable reason for … failure to serve … properly."). Additionally, district courts must consider whether the party seeking an equitable tolling exception "acted with reasonable diligence during the time period she seeks to have tolled" and "has proved that the circumstances are so extraordinary that the doctrine should apply." *Zerilli-Edelglass* v. *New York City Transit Authority*, 333 F.3d 74, 80-81 (2d Cir. 2003) (internal citations and quotation marks omitted).

District courts in New York have largely declined to approve exceptions to the three-month mandatory service period on the basis of equitable tolling, only allowing for the exception in "rare (and distinguishable) instances" that "do not extend to … neglect." *White* v. *Local 46 Metallic Lathers Union and Reinforcing Iron Workers of New York City*, No. 01 Civ. 8277 (RMB) (GWG), 2003 WL 470337 (S.D.N.Y. Feb. 24, 2003) at *4 (quoting *Irwin* v. *Dept. of Veteran's Affairs*, 498 U.S. 89, 96 (1990)). *See also Safran Electronics and Defense SAS* v. *Exail SAS*, 764 F. Supp. 3d 133, 144 (S.D.N.Y. 2025) ("Any such exception [to the FAA's three-month limitations period] stands on already shaky ground…[and] Petitioners have not shown any equitable reason." (internal quotations omitted)); *Pennsylvania Engineering Corp.* v. *Islip Resource Recovery Agency*, 714 F. Supp. 634, 638 (E.D.N.Y. 1989) ("[P]laintiffs cannot use a common law exception to circumvent the [FAA]'s strict time limitations.").

*BurgherGray LLP* v. *Klug*, No. 25 Civ. 2104 (ER), 2025 WL 3563176, at *6-7

(S.D.N.Y. Dec. 12, 2025).

The Award was issued on December 20, 2024, and though the Petition

was filed three months later on March 20, 2025, it was not served until

May 14, 2025. (Dkt. #9). Indeed, even Mr. Malato's request for summons was

outside the three-month window. (Dkt. #4, 5). Mr. Malato counters that

because (i) the Terms of Service recites that disputes are governed by New York

20

law and (ii) "filing" under New York Civil Practice Law and Rules ("CPLR") Sections 304(c) and 7511 occurs when a petition is filed with the court, his Petition is timely.  (Pet. Reply 6).  But as DigitalOcean notes, Section 7511 speaks to petitions to vacate brought in state court, and does not affect the deadline for service set forth in 9 U.S.C. § 12.  (*See* Resp. Reply 4-5).  *See, e.g., Hakala* v. *J.P. Morgan Sec., Inc.*, 186 F. App'x 131, 133 (2d Cir. 2006) (summary order) ("As the district judge correctly recognized, by its plain language, § 12 applies only to notice, *i.e.,* service, it does not apply to filing." (citing *American Postal Workers Union, AFL-CIO* v. *U.S. Postal Serv.*, 823 F.2d 466, 470 (11th Cir. 1987) (noting that 9 U.S.C. § 12 "plainly requires *service*, rather than mere filing, within 3 months of the arbitration award" (emphasis in original)))).  Accordingly, Mr. Malato's Petition is untimely.  In the interest of completeness, however, the Court will proceed to address the merits of his arguments for vacatur.[4]

### 2.    The Court Will Confirm the Award

#### a.    The Award Was Not Rendered in Manifest Disregard of the Law

While Mr. Malato argues several bases for vacatur, the factual support for several of them is the same:  Mr. Malato argues that the Arbitrator erred in

---

[4]    As a second threshold issue, DigitalOcean claims that Mr. Malato failed to properly serve it with the petition.  (*See* Resp. Br. 11-13; Resp. Reply 5-6).  As support, DigitalOcean submits a declaration from Adrianne Cherpak, the company's legal operations manager, who avers that the recipient of the petition, Zack Nelson, is not "an authorized agent by appointment or law to receive service of process on behalf of DigitalOcean."  (Cherpak Decl. ¶ 5).  However, in the absence of a statement from Mr. Nelson himself, the Court cannot exclude the possibility that he represented himself to the process server as an appropriate agent for service.  (*See* Pet. Reply 7 (collecting cases)).  The Court will not grant dismissal of the petition on this basis.

21

not giving adequate consideration to his expert witnesses' testimony, and instead crediting DigitalOcean's expert's testimony.  (*See, e.g.*, Pet. Br. 2 ("The decision of the Arbitrator must be vacated as the Arbitrator acted in manifest disregard of the law in disregarding the Petitioner's expert report, in favor of the Respondent's legally insufficient expert opinion — which presented conclusions that were internally inconsistent and not based on the facts."), 4 (arguing that his experts should be credited because their "only mandate was to get to the truth"), 4 (arguing that DigitalOcean's expert issued opinions for which he provided "no evidentiary support"), 5 ("The entire set of accusations attempting to pass blame on to the Petitioner was fiction."); Pet. Reply 1 ("There is no justification for an award that is based on a fictional fact scenario that has no supporting evidence in the record")).  In point of fact, the Arbitrator was empowered to credit one witness's testimony over another, and his exercise of that power does not amount to manifest disregard.

In order "[t]o succeed in challenging an award under the manifest disregard standard, a party must make a showing that the arbitrator[ ] knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Seneca Nation*, 988 F.3d at 626 (internal quotation marks omitted).  "In addition to this 'subjective component,' a finding of manifest disregard requires an objective determination that the disregarded legal principle was 'well defined, explicit, and clearly applicable.'" *Id.* (quoting *Westerbeke*, 304 F.3d at 209).  Mr. Malato fails to make those showings here.

22

As an initial matter, the factual premise of several of the manifest disregard arguments is flawed.  Mr. Malato cites the following language from the Award:

> In October 2021 approximately $5,000,000 in Bitcoins were stolen by a third-party criminal attack **from a virtual machine created by Malato using Digital's cloud infrastructure** (a "Droplet") pursuant the terms of the TOS. Exhibit 1, p1.

(Pet. Br. 5; Pet. Reply 1 (emphasis in original)).  He takes umbrage at the suggestion that the hack originated in, or that the hacker gained access to DigitalOcean through, his Droplet — which suggestion, he argues, flies in the face of both sides' positions that the hacker entered in through DigitalOcean's host server.  (Pet. Br. 5; Pet. Reply 1-2).  But Mr. Malato misperceives the Arbitrator's statement, which is a factually accurate recitation of the location from which the Bitcoin was stolen, and not the location from which the hack originated.  (Resp. Br. 15 n.7 (making same point)).

In any event, the manifest disregard standard does not extend to the parties' disputes over the evidence, as recently recognized by a sister court in this District:

> "[T]he Second Circuit does not recognize *manifest disregard of the evidence* as proper grounds for vacating an arbitrator's award." *Wallace* v. *Buttar*, 378 F.3d 182, 193 (2d Cir. 2004) (emphases added); *Pfeffer* v. *Wells Fargo Advisors, LLC*, 723 F. App'x 45, 47 (2d Cir. 2018) (summary order) (declining to recognize manifest disregard of the evidence as a proper ground for vacatur).  Petitioners may disagree with the Arbitrator's "evaluation of the evidence," but the Award "may not be vacated because of [Petitioner's] disagreements" with the Arbitrator's evaluations.  *Data & Dev., Inc.* v. *InfoKall, Inc.*, 513 F. App'x 117, 118 (2d Cir. 2013)

23

(summary order). Even if there was "strong evidence favoring [Petitioners]" in the underlying Arbitration, this Court "may not conduct a reassessment of the evidentiary record." *Wallace*, 378 F.3d at 193. "The [A]rbitrator was entitled to weigh the evidence in making [her] factual findings," even if they disappoint Petitioners. *Oldcastle Precast, Inc.* v. *Liberty Mut. Ins. Co.*, 838 F. App'x 649, 651 (2d Cir. 2021) (summary order).

*R.W. Chelsea Energie LTD.* v. *Vision Indian Ocean (V.I.O.) SA*, No. 24 Civ. 6790 (DEH), 2025 WL 3456670, at *3 (S.D.N.Y. Dec. 1, 2025). The Arbitrator made clear in the Award that he had "reviewed the Phase I documents submitted by the parties" (Award 1), and he referenced several of those documents in explaining his rationale (*id.* at 2-3). The parties' documents, in turn, contained all of the arguments that they present to this Court. (*See* Dkt. #11-6, 11-7 (legal submissions made to the Arbitrator)). The fact that the Arbitrator accepted DigitalOcean's arguments over Mr. Malato's, and consequently endorsed Mr. Renner's expert testimony over the Boaventura Group's, does not amount to manifest disregard.

Efforts to recast this argument under specific rules fare no better. Mr. Malato argues, for instance, that the Arbitrator disregarded Federal Rule of Evidence 702 and cases interpreting it, including *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). (Pet. Br. 2-3). To be sure, the Award does not contain a detailed discussion of why the Arbitrator credited the testimony of DigitalOcean's expert over Mr. Malato's. (*See* Award). But that silence does not constitute manifest disregard. For starters, the Arbitrator is not bound by the Federal Rules of Evidence. (*See* TOS § 13.3 (agreeing to use of AAA

24

Consumer Arbitration Rules); AAA Consumer Arbitration Rule R-32 ("Following the legal rules of evidence shall not be necessary.")).  And indeed, Mr. Malato did not mention the Federal Rules of Evidence or *Daubert* in his submissions to the Arbitrator.  (Dkt. #11-6).  In addition, the Second Circuit has admonished lower courts reviewing arbitral awards that they "cannot presume that the arbitrator is capable of understanding and applying legal principles with the sophistication of a highly skilled attorney."  *Wallace* v. *Buttar*, 378 F.3d 182, 190 (2d Cir. 2004).  Here, "[b]ecause the parties bargained for the arbitrator's construction of their agreement," *i.e.*, the Terms of Service, "an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits."  *Oxford Health Plans*, 569 U.S. at 569 (internal quotation marks omitted) (quoting *E. Assoc. Coal Corp.*, 531 U.S. at 62).

Mr. Malato separately argues that the Arbitrator manifestly disregarded the law by citing to, and relying on, Terms of Service provisions in which the parties agreed to limit DigitalOcean's liability.  (Pet. Br. 5-8 (citing Award 2 (citing TOS 10.1-10.3))).  According to Mr. Malato, New York law prohibits waivers of liability for gross negligence, and the hack in this case amounted to just that.  This Court's review of case law in the area discloses a dispute among district courts regarding a federal court's ability under the FAA to vacate an arbitral award on public policy grounds.  *Compare, e.g.*, *New York & Presbyterian Hosp.* v. *N.Y. State Nurses Ass'n*, No. 24 Civ. 9865 (RA), 2025 WL 2793686, at *3 (S.D.N.Y. Sept. 30, 2025) ("A court may also vacate an arbitration award on public policy grounds, though this authority is 'narrowly

25

circumscribed to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant ... and not from general considerations of supposed public interests.'" (quoting *Saint Mary Home, Inc.* v. *Serv. Emps. Int'l Union, Dist. 1199,* 116 F.3d 41, 45 (2d Cir. 1997))),[5] *and Loc. 97, Int'l Bhd. of Elec. Workers, A.F.L.-C.I.O.* v. *Niagara Mohawk Power Corp.*, 196 F.3d 117, 125 (2d Cir. 1999) ("*Niagara Mohawk*") (same), *with Eletson Holdings, Inc.* v. *Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 568 n.15 (S.D.N.Y. 2024) ("The Second Circuit has expressly rejected the more permissive approach by other Circuits to vacatur of arbitral awards on other non-statutory bases, such as when the awards are 'completely irrational,' 'arbitrary and capricious,' or 'contrary to an explicit public policy.'" (quoting *Porzig*, 497 F.3d at 139)).

---

[5]     The original source for these quotes appears to be *Muschany* v. *United States*, 324 U.S. 49, 66 (1945) (underscoring added):

> No other case has come to our attention which has declared that a commission or purchase contract is invalid on the ground of public policy. <u>Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.</u> *Vidal* v. *Mayor, etc., of Philadelphia*, 2 How. 127, 197, 198, 11 L.Ed. 205. <u>As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy.</u> *Twin City Pipe Line Co.* v. *Harding Glass Co.*, 283 U.S. 353, 51 S.Ct. 476, 75 L.Ed. 1112, 83 A.L.R. 1168; *Frost & Co.* v. *Coeur D'Alene Mines Corp.*, 312 U.S. 38, 61 S.Ct. 414, 85 L.Ed. 500. It is a matter of public importance that good faith contracts of the United States should not be lightly invalidated. <u>Only dominant public policy would justify such action.</u> In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, this Court should not assume to declare contracts of the War Department contrary to public policy. The courts must be content to await legislative action.

This Court has previously recognized a limited public policy exception for vacating arbitral awards. *See, e.g.*, *One World Filter Corp.* v. *Koslow Techs. Corp.*, No. 21 Civ. 10769 (KPF), 2025 WL 2720963, at *9 (S.D.N.Y. Sept. 24, 2025). And it recognizes that as a matter of public policy, "New York courts will decline to enforce a contractual limitation or waiver of liability clause when there is willful or grossly negligent or recklessly indifferent conduct." *Baidu, Inc.* v. *Register.com, Inc.*, 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (citing *Kalisch-Jarcho, Inc.* v. *City of New York*, 58 N.Y.2d 377, 384-85 (1983)). That said, "New York [c]ourts set the bar quite high in placing misconduct within the exceptions, [however,] 'demanding nothing short of ... a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts.'" *Deutsche Lufthansa AG* v. *Boeing Co.*, No. 06 Civ. 7667 (LBS), 2007 WL 403301, at *3 (S.D.N.Y. Feb. 2, 2007) (quoting *Net2Globe Int'l, Inc.* v. *Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 454 (S.D.N.Y. 2003)), *cited in Brink's Glob. Servs. USA, Inc.* v. *Bonita Pearl Inc.*, No. 22 Civ. 6653 (PGG), 2025 WL 1666303, at *23 (S.D.N.Y. June 12, 2025).

Mr. Malato has not made such a showing here. For one thing, the Arbitrator specifically rejected a gross negligence argument after finding that "Digital's expert opined that Digital had reasonable industry accepted cyber-security controls in place to prevent and deter malicious activity within their corporate environment. I find this opinion to be persuasive and to be

27

uncontroverted by Malato or his expert." (Award 2). *See Niagara Mohawk*, 196 F.3d at 124 ("[A] reviewing court is bound by the arbitrator's factual findings, interpretation of the contract and suggested remedies."). However, even crediting Mr. Malato's expert witnesses (Dkt. #11-2, 11-4), they speak at most to vulnerabilities in DigitalOcean's cybersecurity systems in October 2021; they do not support a finding of malice, recklessness, or wantonness. For all of these reasons, therefore, Mr. Malato has not demonstrated manifest disregard.

b.    **The Arbitration Proceeding Was Fundamentally Fair**

Mr. Malato repackages several of his manifest disregard arguments as challenges to the fairness of the Arbitration. For example, he complains that "the Arbitrator's failure to consider actual evidence, and instead adopting a phantom theory that had no evidentiary support ... has deprived the Petitioner of 'a fundamentally fair hearing[.]'" (Pet. Br. 7 (quoting *Mical* v. *Glick*, 581 F. App'x 568, 570 (7th Cir. 2014) (unreported decision))). At its core, however, Mr. Malato's argument is really an objection to how the Arbitrator weighed the evidence, which does not amount to "refusing to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). In other words, "[w]here the losing party in an arbitration merely takes issue with the weight accorded to certain evidence actually considered by the [Arbitrator] or with the [Arbitrator's] rejection of arguments related to such evidence," it is "clear that vacatur is not appropriate under Section 10(a)(3)." *In re Arb. Between Interdigital Commc'ns Corp. & Samsung Elecs. Co., Ltd.*, 528 F. Supp. 2d 340, 352 (S.D.N.Y. 2007). Here, Mr. Malato's argument "that the [Arbitrator] failed to give the evidence

28

the 'consideration it deserved' must be rejected" by the Court "as an improper 'attempt to probe the [Arbitrator's mind] as to how they reached their judgment.'" *Id.* (quoting *Hunt* v. *Mobil Oil Corp.*, 654 F. Supp. 1487, 1512 (S.D.N.Y. 1987)).

### c.    Mr. Malato Has Not Demonstrated Partiality

As a second set of challenges to the process by which the Award was reached, Mr. Malato advances claims of arbitrator partiality.  In particular, Mr. Malato complains that the Arbitrator (i) failed to enforce discovery rules in a manner that prevented him from "securing any meaningful discovery" during the pre-arbitration stage; (ii) granted DigitalOcean's request for an extension of deadlines after the company changed counsel; and (iii) requested that the parties send documents directly to his home.  (Pet. Br. 9-10; Pet. Reply 7).[6]

The Court dismisses Mr. Malato's second claim out of hand; extending courtesy to a litigant who has recently changed counsel is not partiality.  And as for his complaints about the Arbitrator's procedural rulings, the Court takes its cues from the Second Circuit, which has "repeatedly said that adverse rulings alone rarely evidence partiality." *Scandinavian Reinsurance Co. Ltd.*, 668 F.3d at 75; *see also Nat'l Indem. Co.* v. *IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 481 n.28 (S.D.N.Y. 2016) ("However, neither an arbitrator's disagreement with party's position, nor adverse rulings against a party,

---

[6]    Under the heading of evident partiality, Mr. Malato also includes contentions that the Arbitrator "was not prepared to understand the case." (Pet. Br. 9).  Competence, however, is not part of the partiality inquiry, and Mr. Malato's complaints about the Arbitrator's acumen are addressed elsewhere in this Opinion.

themselves indicate unfair bias." (citing *Scandinavian Reinsurance Co. Ltd.*, 668 F.3d at 75; *Thomas C. Baer, Inc.* v. *Architectural & Ornamental Iron Workers Local Union No. 580*, 813 F.2d 562, 565 (2d Cir. 1987))), *amended*, No. 15 Civ. 1165 (NRB), 2016 WL 3144057 (S.D.N.Y. Apr. 14, 2016), *and aff'd sub nom.*, *Nat'l Indem. Co.* v. *IRB Brasil Reseguros S.A.*, 675 F. App'x 89 (2d Cir. 2017) (summary order).  (*See also* Resp. Br. 18 (noting that (i) Mr. Malato agreed to forgo an evidentiary hearing at AAA and (ii) the Terms of Service mandated use of AAA's Consumer Rules)).

Finally, the Court finds no partiality in the Arbitrator's directive that the parties send materials to his home.  While Mr. Malato muses that the arrangement "made *ex parte* communications a real possibility" (Pet. Br. 10), he offers no evidence that any such communications occurred with either side.  In sum, no reasonable person reviewing this record could conclude that the Arbitrator was partial to one side.[7]  And with this third set of challenges rejected, Mr. Malato has failed to meet his burden of proving a basis for vacatur of the Award.

---

[7]    Even if Mr. Malato had demonstrated partiality on the part of the Arbitrator, which he has not, his contemporaneous failure to raise these issues to the Arbitrator amounts to a waiver.  *See AAOT Foreign Econ. Ass'n (VO) Technostroyexport* v. *Int'l Dev. & Trade Servs., Inc.*, 139 F.3d 980, 982 (2d Cir. 1998) ("Where a party has knowledge of facts possibly indicating bias or partiality on the part of an arbitrator he cannot remain silent and later object to the award of the arbitrators on that ground.  His silence constitutes a waiver of the objection." (quoting *Ilios Shipping & Trading Corp.* v. *American Anthracite & Bituminous Coal Corp.*, 148 F. Supp. 698, 700 (S.D.N.Y.), *aff'd*, 245 F.2d 873 (2d Cir. 1957) (per curiam))).

### d.     The Court Confirms the Award

As noted, a court must confirm an arbitration award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11" of the FAA, which permit vacatur of an arbitrator's decision "only in very unusual circumstances." *Seneca Nation of Indians*, 988 F.3d at 625; *Oxford Health Plans LLC*, 569 U.S. at 568; 9 U.S.C. § 9.  Mr. Malato has identified no basis for vacatur of the Award.  Accordingly, the Court confirms the Award.

### 2.     The Court Awards Post-Award, Prejudgment Interest and Post-Judgment Interest

DigitalOcean seeks not merely the agreed-upon damages figure of $6,399.04, but also the award of pre- and post-judgment interest.  (Resp. Br. 21-23).  Courts in New York recognize two periods of prejudgment interest:

> First, interest accrues under N.Y. C.P.L.R. § 5001(b) "from the earliest ascertainable date the cause of action existed" until the date the award is granted.  Once the award is entered, interest accrues "upon the total sum awarded … from the date the verdict was rendered or the report or decision was made to the date of entry of final judgment." *Id.* § 5002.

*ExxonMobil Oil Corp.* v. *TIG Ins. Co.*, 44 F.4th 163, 179-80 (2d Cir. 2022).  With respect to pre-award interest, the Second Circuit has observed that

> In New York, by statute, the default rule is that pre-award interest "shall be recovered upon a sum awarded because of a breach of performance of a contract." N.Y. C.P.L.R. § 5001(a).  Interest accrues "from the earliest ascertainable date the cause of action existed," *id.* § 5001(b), and is generally mandatory. *J. D'Addario & Co.* v. *Embassy Indus., Inc.*, 20 N.Y.3d 113, 117, 957 N.Y.S.2d 275, 980 N.E.2d 940 (2012); *see also New England Ins. Co.*, 352 F.3d at 603.  Pre-award interest "is not a penalty," and is intended to "compensate the wronged party for the loss of use of the money." *J.*

31

> *D'Addario & Co.*, 20 N.Y.3d at 117-18, 957 N.Y.S.2d 275, 980 N.E.2d 940.
>
> Statutory pre-award interest is not required or available, however, where the parties' contract is "sufficiently clear" that statutory interest was not "contemplated by the parties at the time the contract was formed." *Id.* at 118, 957 N.Y.S.2d 275, 980 N.E.2d 940.

*Id.* at 178; *see also id.* at 170 ("[a]lthough parties may contract around the requirement, courts apply a clear-statement rule for contracts purporting to waive that mandatory requirement"). By contrast, "[u]nder New York law, post-verdict prejudgment interest is mandatory." *Adrian* v. *Town of Yorktown*, 620 F.3d 104, 107 (2d Cir. 2010) (citing N.Y. C.P.L.R. § 5002).[8]

---

[8]    Whether a particular contract is "sufficiently clear" on the issue of interest has spawned a fair amount of litigation. In the *J. D'Addario & Co.* case mentioned in the text, the relevant contract specified that, in the event of a breach, liquidated damages was the "sole remedy" and "sole obligation," and that each party had "no further rights" beyond bank interest on the down payment in escrow. *J. D'Addario & Co.* v. *Embassy Indus., Inc.*, 20 N.Y.3d 113, 118 (2012). The New York Court of Appeals held that this language was "sufficiently clear" to establish that the parties intended to waive their rights to statutory pre-award interest. *Id.*; *see also ExxonMobil Oil Corp.* v. *TIG Ins. Co.*, 44 F.4th 163, 178 (2d Cir. 2022) (finding statement that "[i]t is expressly agreed that any decision, award, or agreed settlement made as a result of an ADR process shall be limited to the limits of liability of this Policy" to be "sufficiently clear" to establish waiver); *Ithilien Realty Corp.* v. *176 Ludlow, LLC*, 33 N.Y.S.3d 182, 183 (1st Dep't 2016) (finding terms of contract requiring use of interest-bearing escrow account to be "sufficiently clear" that "the amount escrowed, including interest earned, should be the exclusive remedy to the wronged party").

In other cases, however, courts have declined to find a waiver of pre-award interest where the contract was silent or insufficiently specific on the subject. *See, e.g., Delshah 60 Ninth, LLC* v. *Free People of PA LLC*, No. 20 Civ. 5905 (JMF), 2024 WL 5107364, at *2 (S.D.N.Y. Dec. 13, 2024) (rejecting argument of "waiver through silence"); *IHG Harlem I LLC* v. *406 Manhattan LLC*, 203 N.Y.S.3d 543, 546 (1st Dep't 2024) (noting that in *J. D'Addario*, "the parties had designated in their agreement [i] a sole remedy of [ii] a liquidated sum, that [iii] included compensation for the lost use of that money over time, and [iv] explicitly waived all further rights and obligations. The majority decision does not indicate that anything less would provide sufficient clarity to infer a waiver of prejudgment interest."); *see generally Katzman* v. *Helen of Troy Texas Corp.*, No. 12 Civ. 4220 (PAE), 2013 WL 1496952, at *6 (S.D.N.Y. Apr. 11, 2013) ("The Court reads *J. D'Addario* to adopt a clear-statement rule governing waivers of a party's right under C.P.L.R. § 5001(a) to statutory prejudgment interest. Under *J. D'Addario*, parties may contract around that right, but to be valid, a party's waiver thereof must be clear and

The Arbitrator found that pre-award interest was not warranted because "the TOS [Terms of Service] does not provide for interest on that amount." (Award 2).  Accordingly, the Court may not award such interest.  *See KPMG, LLP* v. *Tongxin Int'l, Ltd.,* No. 13 Civ. 4567 (AT), 2014 WL 13113821, at *4 (S.D.N.Y. Jan. 2, 2014) (citing *Moran* v. *Arcano*, No. 89 Civ. 6717 (CSH), 1990 WL 113121, at *2 (S.D.N.Y. July 27, 1990) ("Arbitrators may in their discretion provide for pre-award interest, and when they do, it becomes a part of their award upon which judgment enters; but if the award is silent on pre-judgment interest, a court is not entitled to award such interest.  That at least is the result under the New York arbitration statute, and I am aware of no contrary authority under the Federal Arbitration Act." (internal citations and quotation marks omitted))); *Finger Lakes Bottling Co.* v. *Coors Brewing Co.,* 748 F. Supp. 2d 286, 289 (S.D.N.Y. 2010) ("If the arbitrator had authority to award prejudgment interest and declined to do so, then the court will not do so in an enforcement action." (collecting cases)); *cf. Schiferle* v. *Cap. Fence Co.,* 61 N.Y.S.3d 767, 772 (4th Dep't 2017) ("It is well established, however, that an arbitrator's refusal to grant such interest — even in contract disputes where prejudgment interest is normally mandatory (see CPLR 5001[a]) — is not itself a sufficient basis for upsetting an arbitration award." (collecting cases)).

"Unlike pre-award prejudgment interest, 'post-award prejudgment interest is a statutory requirement that falls inherently outside an arbitrator's

---

express, as in *J. D'Addario*, where the parties defined a specific problem and 'chart[ed] their own course' as to it in a 'clear, complete document.'").

authority and within the authority of the courts.'" *Lanesborough 2000, LLC*, 167 F.4th at 44 (quoting *ExxonMobil Oil Corp.*, 44 F.4th at 180). "'Post-award, prejudgment interest is generally awarded at the discretion of the district court, and there is a presumption in favor of awarding such interest.'" *Three Bros. Trading, LLC* v. *Generex Biotechnology Corp.*, No. 18 Civ. 11585 (KPF), 2020 WL 1974243, at *12 (quoting *In re Arb. Between Westchester Fire Ins. Co.* v. *Massamont Ins. Agency, Inc.*, 420 F. Supp. 2d 223, 226 (S.D.N.Y. 2005)).

"The common practice among courts within the Second Circuit is to grant interest at a rate of nine percent, the rate of pre-judgment interest under New York State law." *Herrenknecht Corp.* v. *Best Road Boring*, No. 06 Civ. 5106 (JFK), 2007 WL 1149122, at *3 (S.D.N.Y. Apr. 16, 2007) (internal quotation marks omitted); *see* N.Y. C.P.L.R. § 5004(a). The Court, in its discretion, awards post-award, prejudgment interest on the damages figure of $6,399.04 at an annual rate of 9% from the date the Award was issued, December 20, 2024, to the date of entry of judgment in this case. In so doing, the Court concludes that such interest is "'fair, equitable, and necessary to compensate the wronged party fully.'" *Three Bros. Trading*, 2020 WL 1974243, at *13 (quoting *Wickham Contracting Co.* v. *Loc. Union No. 3, Int'l Bhd. Of Elec. Workers, AFL-CIO*, 955 F.2d 831, 835 (2d Cir. 1992)).

Post-judgment interest, which is mandatory, will accrue at the rate specified in 28 U.S.C. § 1961. Finally, the Court sees no basis to disturb the Arbitrator's findings regarding the allocation of administrative and attorneys' fees.

34

**CONCLUSION**

For the reasons set forth above, the Court GRANTS DigitalOcean's motion for summary judgment in substantial part:  It confirms the Award of damages of $6,399.04.  It also awards prejudgment interest at an annual rate of 9% from December 20, 2024, through the date of entry of judgment in this case, on the damages figure of $6,399.04, and awards post-judgment interest at the statutory rate.  Conversely, the Court DENIES Mr. Malato's cross-motion for summary judgment seeking vacatur of the Award.

The Clerk of Court is directed to terminate the motions pending at docket entries 10 and 17, to enter judgment as just specified, and to close this case.

SO ORDERED.

Dated:      March 11, 2026
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge